**LANGHAM, LANGSTON & BURNETT,**
Appellant,

v.

**Thomas B. BLANCHARD,** Trustee of the Estate of Lone Star Sulphur Corporation, Bankrupt, Appellee.

No. 16498.

United States Court of Appeals
Fifth Circuit.

June 29, 1957.

Rehearing Denied Aug. 15, 1957.

St. John Garwood, Jr., Houston, Tex., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., for appellant.

Thomas B. Blanchard, Houston, Tex., for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and JONES, Circuit Judges.

JONES, Circuit Judge.

Lone Star Sulphur Corporation was organized to exploit a supposed sulphur deposit on land leased to it. Wells had been drilled. No sulphur in paying quantities had been produced. The company had ceased operation. It was without funds and without credit. Efforts of management of the corporation to raise additional money to continue the efforts to produce sulphur had been unsuccessful. Such was the plight of the company on December 20, 1954. On that day the appellant, Langham, Langston & Burnett, a partnership, instituted suit against the company in the district court of Harris County, Texas, and on the following day, December 21, 1954, it caused a writ of attachment to be levied upon property of the corporation. A judgment for the partnership and against the corporation for $7,444.46, which included $900.00 attorneys' fees, followed. On March 17, 1955, a levy under execution was made on the property which had been attached and on other property of the corporation. On March 28, 1955, the corporation filed a voluntary petition in bankruptcy. The appellee, T. B. Blanchard, became the bankruptcy trustee. The partnership filed a claim in the bankruptcy proceeding and asserted it as a secured claim by reason of the attachment and levy. The trustee objected to the claim as a secured claim on the grounds that the attachment and levy were made within four months of bankruptcy and that the corporation was insolvent when the attachment and levy were made. Bankruptcy Act, § 67, sub. a(1), 11 U.S.C.A. § 107, sub. a(1). A hearing on the trustee's contest of the claim was held on February 20 and 22, 1956. At that hearing the history of the Lone Star Sulphur Corporation was developed by the testimony of its Treasurer, Charles N. McClendon, and W. G. B. Morrison, its sometime President, Counsel, and Director. Appellant offered the testimony of Clayton Stephenson, a chemical engineer and one of the designers of the bankrupt's plant, to prove the value that parts of the bankrupt's plant would have if taken down and moved 100 miles. Objection was made and sustained to the testimony on the ground that the witness did not qualify as an expert. Having heard all the evidence the referee determined that the Lone Star Sulphur

Corporation was insolvent at the time the lien attached. An order was entered which sustained the trustee's contention and relegated the claimant-appellant to the position of an unsecured creditor.

On a petition to review the referee's order the district court, in a memorandum opinion, held that the referee's determinations were supported by the evidence, and the referee's order was affirmed. On September 4, 1956, the appellant filed a motion to reopen the proceedings and received as newly discovered evidence a mineral lease from the former lessors of the bankrupt to the purchaser of the bankrupt's assets. The lease was for production of sulphur from the land which had formerly been leased to the bankrupt. The lease was executed on November 22, 1955, but not placed of record until May 1, 1956. The trustee opposed the motion on the ground that the newly discovered evidence was not material. The motion was denied. From the order sustaining the referee's determination that the appellant's claim was unsecured, and from the order denying the motion to reopen the proceedings, this appeal is taken.

The findings of the referee, approved by the district court, are under attack by the appellant. Among these findings are:

"VII

"I find that at the time of the filing of the suit, the execution of the attachment, the judgment foreclosing the same, and the levy of the execution by the Sheriff of Fort Bend County, Texas, the said Lone Star Sulphur Corporation was not a going concern, but had ceased operations several months prior thereto.

"VIII

"I further find that said corporation was unable to pay its debts from approximately October 1954 to the date of bankruptcy, and was without credit and had no property that could be sold for sufficient to pay its debts, and that the officers of the corporation had been wholly unable to refinance the corporation.

"XII

"I find that there were filed in these proceedings claims in excess of $146,-000.00, representing the liabilities of the corporation and which claims had existed prior to the issuing of claimant's judgment.

"XVI

"I find that the trustee, after duly advertising, tendered the properties of the bankrupt for sale on sealed bids, and that the largest bid submitted, which was a combination of various bids for specific items, was in the sum of $44,691.00 which sale was not confirmed by the referee upon the application and objection of the trustee as being insufficient, and that the trustee was authorized to negotiate a sale.

"XVII

"I find that the trustee did report a negotiated sale in the sum of $80,000.00 for the entire assets of the bankrupt and which sale was, on the recommendation of the trustee, confirmed by the court".

 It is urged that these findings are erroneous, both in the application of the law and in the evaluation of the evidence; erroneous in law in that the "equity" rather than the "bankruptcy" test of insolvency was applied; erroneous in the determination of facts in that the referee improperly considered evidence of insolvency as of a time later than that of the attachment. Section 67, sub. a(1) of the Bankruptcy Act provides:

"Every lien against the property of a person obtained by attachment, judgment, levy or other legal or equitable process or proceedings within four months before the filing of a petition initiating a proceeding under this Act by or against such person shall be deemed null and void (a) if at the time when such lien was obtained such person was insolvent * * *." 11 U.S.C.A. § 107, sub. a(1).

The meaning of "insolvent", as used in Section 67, sub. a(1), is that given to it

in Section 1(15) of the Act where it is said:

"A person shall be deemed insolvent within the provisions of this Act whenever the aggregate of his property * * * shall not, at a fair valuation, be sufficient in amount to pay his debts". 11 U.S.C.A. § 1(15).

This is a mathematical test, static in character, and its purpose was to remove the confusion that existed under the prior Act. Lasswell v. Stein-Block Co., 5 Cir., 1937, 93 F.2d 322. That it differs from the equity test of insolvency, inability to meet obligations as they mature, is clear. Finn v. Meighan, 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624, 57 Am.Bankr.Rep.N.S., 740. The two tests must be kept distinct, and reversible error will result from their confusion or commingling. Duncan v. Landis, 3 Cir., 1901, 106 F. 839, 5 Am. Bankr.Rep. 649; In re Utrecht Coal Co., 2 Cir., 1933, 63 F.2d 745, 23 Am.Bankr. Rep.N.S., 155.

██ Appellant points to Finding of Fact VIII, *supra,* as showing that the referee used the wrong test. This does not appear from a reading of that Finding. In Mitchell v. Investment Securities Corporation, 5 Cir., 1933, 67 F.2d 669, this court said of bankruptcy insolvency:

"Statutory as well as commercial insolvency arises out of, and consists in, inability to pay debts. One is insolvent under the statute when his assets, if converted into cash, at a fair not forced sale will not pay them. In both cases solvency is tested by ability to pay debts, in the one case promptly, in the other, in time." 67 F.2d 669, 671.

It appears that the referee used "unable to pay" in a sense no different from the converse of "ability to pay" as used in the Mitchell opinion. The referee cited and relied on the Mitchell decision. In the memorandum opinion affirming the referee, the district court quotes the definition of § 1(15) as the correct meaning of insolvency. We do not find that

an improper test was applied. In reviewing the finding of insolvency, this court will not disturb the resolution of that factual question unless it is clearly erroneous. Bankruptcy General Order 36, 11 U.S.C.A. following section 53; Rule 52(a) Fed.Rules Civ.Proc., 28 U.S. C.A.; In re Di Palo (Weinberger), 2 Cir., 1955, 218 F.2d 816.

██ The argument that the finding is clearly erroneous rests on the contention that it disregarded evidence which was conclusive and relied on evidence which was inadmissible. It has been said of the bankruptcy test of insolvency,

" * * * the somewhat abstract and more stringent balance sheet test might, especially under certain conditions, be harder of practical application than the more tangible and, perhaps, more natural equity test." 1 Collier on Bankruptcy, 14th Ed. 92, Par. 1.19[1].

Such a situation is presented here. The bankrupt corporation was, at the time the lien attached "financially dead or mortally wounded". In re Fred D. Jones Co., 7 Cir., 1920, 268 F. 818, 819, 46 Am. B.R. 396. It was not a going concern and it would not be proper for the assets to be valued at a going concern value. In re Brown Commercial Car Co., 7 Cir., 1915, 227 F. 387, 36 Am.B.R. 45.

This court has dealt with a similar situation in Mitchell v. Investment Securities Corp., supra. In that case, an action to set aside a transfer as preferential, it appeared that the Case-Fowler Company, a hardwood lumber producer, had, after several years of profitable operation, experienced substantial reverses and that the hardwood lumber market had collapsed. For a year prior to a transfer in April, 1931, the lumber company's creditors had deferred action while efforts were made to secure additional capital for refinancing. In connection with these efforts a statement was prepared which showed the assets at cost less depreciation. The testimony indicated that these figures would be a reasonable indication of fair value only if the company were a going concern

and that unless new life could be imparted to the company the assets could not be sold or utilized at any substantial figure. Stating that the realities of the situation must control, the court held that Case-Fowler could not be considered a going concern, nor could the stated figures for the assets be accepted. Applicable to the case before us is this statement from the Mitchell opinion:

"When in the light of this statute [11 U.S.C.A. § 1 et seq.] the situation existing when the transfer was made is squarely faced, and all its factors are taken into consideration, the company's lack of credit, its lack of market, the total paralysis of the hardwood industry, the strangling pressure of the blanket bond issue, the pall of its heavy annual losses, and the absolute proven certainty that, unless conditions changed, such losses would follow continued operation, we think the conclusion unavoidable that the company was then starkly insolvent and staggering to its fall." 67 F.2d 669, 672.

The Lone Star Sulphur Corporation had never passed out of the development stage. Its construction costs were carried as assets without satisfactory showing of value of these items. The books carried asset items that, as the referee found, had no value. The physical properties were located upon leased land and the lease had been in default at recurring intervals. The company was existing from day to day, trying to keep people from closing in on it and, as its treasurer said, it "scarcely had eating money." Under such circumstances, on the evidence before him and under the doctrine of Mitchell v. Investment Securities Corporation, supra, the finding that Lone Star Sulphur Corporation was insolvent on the dates of the attachment and levy was required. See also 1 Collier on Bankruptcy, 14th Ed. 124, Par. 1.19 [5]; In re Great Western Biscuit Company, D.C.S.D.Cal., 85 F.Supp. 314; McClung-Logan Equipment Co. v. Friedman, 4 Cir., 1952, 195 F.2d 516.

The testimony of appellant's witness, Clayton Stephenson, was offered to show the value of the plant if dismantled and moved 100 miles from its site. He was an engineer who participated in designing the Lone Star plant. He had appraised chemical plants during a wartime period when such facilities were in short supply and had made estimates of construction costs. On voir dire examination he stated,

"A. No, I have never appraised an existing sulphur plant.

"Q. Have you ever appraised, and when I say 'plant' I mean the buildings and machinery and all paraphernalia; have you ever done that? A. You mean appraise an existing one or estimating cost to build one?

"Q. An existing one. A. No, I have not appraised an existing one."

Objection was made and sustained to the testimony of the witness on the ground that he had failed to qualify as an expert. It is urged that there is error in the ruling. In dealing with review of the decision on the qualifications of an expert, Professor Wigmore says:

"* * * emphatically, the trial court must be left to determine, absolutely and without review, the fact of possession of the required qualification by a particular witness. In most jurisdictions it is repeatedly declared that the decision upon the experiential qualifications of witnesses should be left to the determination of the trial court". II Wigmore on Evidence, 3rd Ed. 641, § 561.

■ This Court has referred to Professor Wigmore's statement with a qualifying "indeed". Roth v. Bird, 5 Cir., 1956, 239 F.2d 257. The statement does not, however, go beyond the pronouncement of this Court that "It is well settled that the qualification of experts is a matter entirely for the trial court". Mutual Life Insurance Co. of New York

v. Treadwell, 5 Cir., 1935, 79 F.2d 487, 489.

In American Jurisprudence it is stated:

"The determination of the question of the competency and qualifications of one offered as an expert witness is addressed to the judicial discretion of the trial judge before whom the testimony is offered, and his ruling in passing on the qualifications of such proposed expert witness will not be disturbed unless the error is clear and involves a misconception of the law; in the latter case a new trial may be granted." 20 Am.Jur. 660, Evidence, § 786.

This Court has put the rule in these words:

"Whether a witness is qualified to testify as an expert is a question for the judge presiding at the trial and his decision thereon is conclusive, unless clearly erroneous as a matter of law." Davidson v. Commissioner of Internal Revenue, 5 Cir., 1937, 91 F.2d 516, 518.

Although it is said in the Davidson case that "the rule is so well settled that it is hardly necessary to cite authorities in support thereof", we may note that it has been applied in a number of more recent decisions, among which are, United States v. Savannah Shipyards, 5 Cir., 1944, 139 F.2d 953; St. Joe Paper Co. v. United States, 5 Cir., 1946, 155 F.2d 93; Allen v. First National Bank of Atlanta, 5 Cir., 1948, 169 F.2d 221; Reuter v. Eastern Air Lines, 5 Cir., 1955, 226 F.2d 443; and Roth v. Bird, supra.

In a case somewhat similar to that before us where testimony as to the value of a mill was rejected by the trial court, the Supreme Court said:

"Whether a witness called to testify to any matter of opinion has such qualifications and knowledge as to make his testimony admissible is a preliminary question for the judge presiding at the trial, and his decision of it is conclusive, unless clearly shown to be erroneous in matter of law." Stillwell and Bierce Manufacturing Co. v. Phelps, 130 U.S. 520, 9 S.Ct. 601, 603, 32 L.Ed. 1035. See also Spring Company v. Edgar, 99 U.S. (9 Otto) 645, 25 L.Ed. 487; Gila Valley, Globe & Northern Railway Co. v. Lyon, 203 U.S. 465, 27 S.Ct. 145, 51 L.Ed. 276.

In another such case an issue was the fair rental value of a silver mill. The defendant introduced as a witness one Geo. K. Sabin who had been engaged in mining for 20 years and he was employed by the defendant as superintendent at the time of the erection and throughout the operating life of the mill. His testimony as to value was excluded on the ground that he was not qualified. In affirming this ruling it was said:

"This ruling of the court was manifestly proper. It appears from the testimony of the witness himself that he knew of no other silver-mill * * * that this was the first silver-mill he had ever been connected with, though he had been engaged in mining for 20 years, and was acquainted with gold-mills enough to know what work they can perform, and what they can earn. He evidently had no such knowledge of the marketable condition or rental value of such property as would render his opinion of any use to the jury beyond the merest guess or conjecture." New York & Colorado Mining Syndicate & Co. v. Fraser, 130 U.S. 611, 9 S.Ct. 665, 668, 32 L.Ed. 1031.

■ The Bankruptcy Act provides that " 'Court' shall mean the judge or the referee of the court of bankruptcy in which the proceedings are pending". 11 U.S.C.A. § 1. The referee is a judicial officer of the bankruptcy court. Adair v. Bank of America National Trust & Savings Association, 303 U.S. 350, 58 S.Ct. 594, 82 L.Ed. 889, 35 A.B.R.N.S. 725. As such he may rule on admissibility of evidence. 2 Remington on Bankruptcy 87, §§ 659–660; Id. 91 § 666.50. His rulings are to be given the benefit of the clearly erroneous doctrine.

Cf. Phillips v. Baker, 5 Cir., 1948, 165 F.2d 578.

■ The referee held that the witness Stephenson did not have the knowledge and experience required in order to qualify as an expert in the valuation of the mill of the bankrupt. This was not shown to be an abuse of discretion nor clearly erroneous. It was not improper to exclude the opinion evidence of one who had knowledge of the values of other types of chemical plants but was inexperienced in the appraisal of sulphur plants. See Stitzer Hotel Co. v. Beyer, 3 Cir., 1932, 55 F.2d 620.

■ Appellant urges that there was an abuse of discretion in the refusal to reopen the proceedings and receive evidence of the lease executed on November 22, 1955. This is said to be conclusive evidence that the assets were worth more than "junk" value. That someone else may wish to try the business does not show that the Lone Star Sulphur Corporation was a going concern in December, 1954, nor would such evidence that the purchaser of all the assets has been able to continue on the same land indicate that the price at which the assets were sold nearly two months prior to the execution of the lease was not the fair sale price.

There being no error, the judgment is Affirmed.

TUTTLE, Circuit Judge (dissenting).

Because of the effect which I think the majority opinion may have on limiting our right to review the acts of referees in bankruptcy relating to the admission of expert testimony, I must respectfully dissent.

I would reject without hesitation, and assume that the majority of the Court would also, the flat statement quoted from Wigmore as to the right of review of the action of a trial court in refusing to receive testimony from a proffered expert. This Court rejected it as recently as Roth v. Bird, 5 Cir., 239 F.2d 257. Moreover all of the citations given in the opinion of the majority, except

the one quoted from Mutual Life Insurance Company of New York v. Treadwell, 5 Cir., 79 F.2d 487, give the true limitations on the Wigmore pronouncement. I think it may be taken as clear that there is no difference of opinion as between the majority here and the writer of this dissent as to the true rule. That rule I think is best stated for our Court in the Roth case, supra.

"Notwithstanding the court's broad discretion in such situation, however, we think its ruling is still reviewable where, as here, rejection of a witness' competency results from the application of an erroneous legal standard as to the nature and extent of the prior experience required to give such testimony probative value. Here, the court required Irving to show some previous experience, either in loading the Wingate or some vessel almost exactly like it, in order to express before the jury his opinion that negligent loading caused its loss, even though the witness several times stated that the same stability factors upon which he relied were applicable generally to vessels of the Wingate type. We think that ruling was too strict and unrealistic, and that all of appellees' objections went only to the weight, rather than the admissibility, of Irving's testimony, which was for the jury." Roth v. Bird, 5 Cir., 239 F.2d 257, 262.

I think it clear that the referee erred as a matter of law in ruling that the expert was not qualified. This is made evident from the quotation of that part of the testimony that is contained in the majority opinion. If the question of valuation tendered by appellants here had been the value of the sulphur plant as an existing plant, I would agree that we could not reverse the referee's refusal to permit Stephenson to testify on such a point. Here, however, he was tendered as an expert as to the value of the parts of the plant entirely aside from their utility as part of an entire operation.

His testimony was to the effect that the movable parts, even though removed as far as 100 miles from the site, had a value greatly in excess of the sum necessary to cause the alleged bankrupt to be solvent at the time of the alleged preference. Not only did Stephenson testify that he had long experience in dealing with chemical machinery and equipment, which he testified was much the same whether used in a sulphur plant or in a different type of chemical plant, but more important and what to me demanded the Court's recognition of his qualifications, he testified that he had experience purchasing, designing and estimating costs of identical types of equipment for use in sulphur plants themselves. Since the question was Stephenson's qualification as an expert on the fair market value of the separate items of equipment if removed from the site, the referee's test, which the majority also seems to consider the proper one—that is, whether he had ever appraised an existing sulphur plant—was, it seems to me, utterly irrelevant. In the New York and Colorado Mining case, supra, quoted in the majority opinion, the Court pointed out that the expert there, though unqualified to testify as to the rental value of a silver mine, was qualified to testify as to the "value of machinery." 130 U.S. 611, 620, 9 S.Ct. 665, 668.

In a field in which opinion evidence is traditionally relied on to establish facts, such as in the field of valuations, it would seem to me that such an obvious error in determining the qualifications of an expert should be corrected under the clearly erroneous rule.

I am also of the opinion that evidence that the same plant was leased within a few months of the hearing to other parties and placed in operation as a going sulphur plant was relevant to the value at the time in issue. I think evidence of this fact should have been admitted and considered by the referee if it had been offered. It was certainly as relevant as evidence of the amount bid at the sale by the referee in bankruptcy, which is certainly no evidence of

fair market value at any time. Liberty National Bank of Roanoke, Va., v. Bear, 265 U.S. 365, 370, 44 S.Ct. 499, 68 L. Ed. 1057. However, since this evidence was tendered only on a motion to re-open proceedings for reception of newly discovered evidence, I would not say that it was an abuse of discretion for the court to deny this motion.

I would reverse the judgment and remand the case for a new hearing before the referee, on which the opinion evidence of the expert witness and the evidence of later use would be received and given such weight as it merits.

Rehearing denied: TUTTLE, Circuit Judge, dissenting.